**Opinion issued May 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-24-00346-CR**

———————————

**DEREK NICK OLGUIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1813575**

---

## MEMORANDUM OPINION

The question presented by this criminal appeal is whether the defendant received ineffective assistance of counsel at trial. A jury found Derek Nick Olguin guilty of the offense of aggravated robbery[1] and assessed his punishment at

---

[1] *See* TEX. PENAL CODE § 29.03(a)(2).

confinement for six years. The trial court entered an affirmative finding that he used or exhibited a deadly weapon, namely a firearm, during the commission of the offense. Olguin now contends that he received ineffective assistance of counsel at trial. Because the threshold constitutional standard for this is not met here, we affirm.

## Background

Jesus Hernandez testified that he parked his truck and trailer along the edge of West Street in Houston to unload lumber at a construction site. When he got out of his truck, he left his door open. As he and a co-worker were unloading the trailer, Hernandez saw a "grayish" or "pinkish" Mercedes-Benz pass by the truck "going really fast" and heard a "small bump." He realized that it had hit his door.

Minutes later, the Mercedes returned. Hernandez identified the driver as Olguin. According to Hernandez, Olguin got out of his car and asked who owned the truck and why the door was open. Hernandez answered that the truck was his and that he "had just barely parked to go and check where [he] was going to unload the material." Olguin said that his car was damaged and demanded that Hernandez pay him. Hernandez refused and said he would call the police to make a report for insurance. Olguin got upset and again demanded payment.

Olguin then went to his car and returned with a weapon—a "black and big" firearm, which Hernandez identified in a photograph admitted at trial. Hernandez

explained: "When [Olguin] was coming, he had [the gun] downward," at his side. When Hernandez asked why Olguin felt a gun was necessary, Olguin replied that "it was just in case." Olguin was "angry" and "[s]omewhat violent." And Hernandez feared that Olgin was going to shoot him.

Hernandez's co-worker called a supervisor and told him that Olguin was holding a weapon and demanding money. Hernandez spoke with the supervisor and asked him to transfer money to his bank account. Hernandez told Olguin that he had to go to an ATM and told Olguin to come back in 30 minutes. Olguin left and did not return.

Afterwards, Hernandez realized that his cell phone—a "large black Samsung"—was missing from the center console of his truck. According to Hernandez, his co-worker saw Olguin, at some point during the events, open the door to Hernandez's truck.

Hernandez spoke with police officers at the scene and gave a description of the Mercedes and Olguin. When Hernandez later left the jobsite, he saw the officers conducting a traffic stop on Olguin a few street away. Hernandez stopped and spoke with them and recovered his missing cell phone.

Kimberly Clegg testified that she witnessed the confrontation at the construction site. She saw Olguin standing beside a "silver beige or champagne" car. He was talking to two men in "construction clothes" and was "[w]aving a

gun"—a long, black rifle—at them and pointing it at Hernandez. Clegg called 911 and reported Olguin's license plate number.

Houston Police Department (HPD) Officers J. Lagrone and D. Reinhold were dispatched to the scene on West Street. There, they spoke with Hernandez, who reported that his cell phone had been stolen.

Officer Lagrone testified that they located a beige Mercedes, bearing the license number Clegg had reported, on West Street and that Olguin was the driver. During a search of the Mercedes, Officer Lagrone saw an "AR pistol" in plain view on the floorboard "by the driver's seat." He described it as an "AR rifle that had a short barrel and no stock, therefore, making it—according to the ATF, an AR pistol." He noted that there was a magazine in the pistol and that the pistol was "loaded with one in the chamber." He also found a cell phone in the Mercedes that Olguin admitted did not belong to him. Olguin claimed that he had found it on the ground at the construction site and had just picked it up.

Officer Reinhold testified that Hernandez came to the scene of Olguin's arrest and identified the phone. Hernandez told Officer Reinhold that Olguin "had the firearm out" but did not point it directly at him.

Harris County Community Supervision and Corrections Department (CSCD) Officer V. Haynes testified that he is a "probation officer." He does not have a caseload. Rather, his primary role is to conduct interviews to "assess the defendants"

4

and write reports for court proceedings. His assessments generally include any criminal history, history of drug use or mental health issues, and the circumstances of the offense at issue.

Officer Haynes explained that defendants can choose whether to participate in an assessment. If they agree in the trial court, a court liaison officer sets up an appointment. Before the interview, defendants are given disclosures and are told that their responses are not confidential and will be given to "the judge and the lawyers." And they are asked to sign a confidentiality waiver.

In this case, Olguin signed a confidentiality waiver. And Officer Haynes interviewed him and authored a report. He gave Olguin a "chance to explain his version of the offense and he chose to do so." According to Officer Haynes, Olguin said that he had his firearm in the car but did not point it at anyone. And Olguin said that his girlfriend took Hernandez's cell phone.

Olguin testified at trial that, just before the incident, he had been arguing with his girlfriend. When he left her house, he drove down West Street. He saw a bulldozer partially in the street and Hernandez's truck parked on the opposite side, with the door open. Olguin tried to drive between the bulldozer and the truck but clipped his driver's side mirror on the truck. Olguin heard a "loud bang" and thought that "they [unidentified] threw something at [him] or shot at [him]." He initially kept driving, but then turned around went back to the scene.

Olguin stated that he went back to identify the owner of the truck "because [he] wanted the insurance." He admitted that he got out of his car with a weapon. He noted that "[i]t's a big gun" and could not be holstered, so he had "it to [his] side." He was fearful because "it was a bad area." According to Olguin, he did not ask for money, but only for Hernandez's insurance information. Rather, it was Hernandez who wanted to pay for the damage in cash. Hernandez said that he would go to his bank and return in an hour. Olgin went to his girlfriend's house to wait. But shortly after, the police showed up.

Olguin identified the AR pistol in evidence at trial as his. He denied that he had pointed it at anyone. He stated that he found the cell phone on the ground in front of Hernandez's truck.

The jury convicted Olguin of aggravated robbery and assessed his punishment at confinement for six years. Olguin did not file a motion for new trial.

## Ineffective Assistance of Counsel

Olguin contends that his trial counsel rendered ineffective assistance because he failed to object to prejudicial testimony by Officer Haynes. According to Olguin, but for the purported error, "there is a reasonable probability that the outcome of the proceeding would have been different."

**A.** *Standard of Review*

The United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As a matter of state and federal law, this right includes the right to reasonably effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make a showing under *either* prong of the *Strickland* test defeats a claim for ineffective assistance. 466 U.S. at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Under *Strickland*'s first prong, we must look to the totality of the representation to determine the effectiveness of counsel—indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. 466 U.S. at 689; *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). We "must be

7

highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

Allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 813–14. In most cases, a direct appeal is an inadequate vehicle for raising an ineffective-assistance claim because the record is undeveloped, and a silent record cannot adequately reflect the motives behind trial counsel's actions. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

When, as here, the record does not reveal the reasons for trial counsel's actions, we "will assume a strategic motivation if any can possibly be imagined." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Trial counsel should generally have an opportunity to explain his or her actions before we find the performance deficient. *Goodspeed*, 187 S.W.3d at 392. Without that opportunity, we should not find trial counsel's performance deficient "unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id*. (quoting *Garcia*, 57 S.W.3d at 440).

8

In rare cases in which counsel's ineffectiveness is apparent from the record, an appellate court may address the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But "the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

Under *Strickland*'s second prong, we must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That an error had "some conceivable effect on the outcome" will not suffice. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Rather, there must be a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt with respect to guilt. *Id.*

**B.    *Failure to Object***

Olguin argues that portions of Officer Haynes's testimony "brought in negative connotations," "took away the presumption of innocence," and deprived him of a fair trial. And the record shows that "not one objection" was made to this testimony, nor was there any attempt to "limit" it. He asserts that "[n]o plausible strategic reason exists to forego the objection[s]." Olguin seems to argue that this is

9

one of those rare cases in which the record demonstrates that his counsel's performance fell below an objective standard of reasonableness as a matter of law and that no reasonable trial strategy could justify, regardless of counsel's subjective reasoning. *See Lopez*, 343 S.W.3d at 143.

"When an ineffective assistance claim alleges that counsel was deficient in failing to object to the admission of evidence, the defendant must show, as part of his claim, that the evidence was inadmissible." *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002).

Olguin conclusorily asserts that the trial court "would have sustained an objection to many of the areas [Officer] Haynes[] discussed" under Texas Rule of Evidence 404(b). Rule 404(b) provides in relevant part: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* TEX. R. EVID. 404(b)(1).

Olguin first complains that Officer Haynes identified himself to the jury as a "probation officer" in the "adult probation" department and used the term "TRAS interview," as follows:

> Q.  .... Now, can you tell me what you currently do for employment?
>
> A.  I'm a ***probation officer*** with the Harris County probation department, ***adult probation***, or CAST union. I assess there.
>
> Q.  I'm sorry. You say assess?

A.    I assess the defendants there.

Q.    . . . . What is—what is your typical role in—or typical job in your current role?

A.    I don't have a caseload. All I do is interview the defendants for— to write a report for court proceedings.

Q.    Okay. These defendants that you interview, do they come to you of their own accord?

A.    They agree here in the courtroom for—to do the ***TRAS interview***, the court liaison officer sets a date for them to either come to the unit or be assessed virtually.

. . . .

Q.    And during your role, do people sometimes—or do they have to make an appointment to interview with you?

A.    No. That's set by the court liaison officer.[2]

(Emphasis added.)

Olguin argues that the trial court would have sustained a Rule 404(b) objection to this testimony because "there is no evidence that [he] was on [] probation." And although the use of the term "TRAS does not overtly say this is a 'risk assessment'— there may well be people who are aware of what this is—and that people who plead guilty get this assessment."

The record does not support Olguin's argument. Officer Haynes's testimony makes clear that his department simply conducts pre-trial assessments. Nothing in the testimony states or suggests that Olguin was personally serving a term of

---

2    Throughout his brief, Olguin identifies Officer Haynes as a "court liaison officer," and he complains that, as such, Haynes's testimony "carrie[d] the imprimatur of the court." As his testimony reflects, however, Officer Haynes is a "probation officer," not the "court liaison officer."

11

community supervision.  And nothing suggests that he pleaded guilty to the instant offense—to the contrary, this testimony occurred during a jury trial.  This is not "[e]vidence of a crime, wrong, or other act." *See* TEX. R. EVID. 404(b).

Olguin also complains about the italicized portions of the following line of testimony by Officer Haynes:

Q.   Okay.  Now, when you meet with these defendants, is there any information that you get about them before you meet with them?

A.   Yes.

Q.   What kind of information do you usually get?

A.   We have the EZnetScheduler, where the liaison officer can enter information about, let's say, ***any mental issues, any drug use admitted in court; also, criminal histories, we look up***.

Q.   Do you get things like their name, their birthdate?

A.   Name, birthday, Social Security number, run it through the system, see the current case, any past cases here or out of state, or maybe within state but out of county.

Q.   And before you meet with somebody who's been interviewed, do you review all that beforehand?

A.   Correct.

Q.   Okay. What else do you review before you meet with a defendant?

A.   ***If they've already been on probation before*** with Harris County or on bond supervision, then there are chronos that I can go through, ***there are drug tests***, possibly, if they've been ordered they may show up.

Q.   Anything else?

A.   The orange sheet, which is a mental health form, to see if they have any diagnosed mental health issues or like if they were ***prescribed psychotropic medications*** in jail.

(Emphasis added.)

12

According to Olguin, the trial court "would likely have sustained any objection about mental illness or possible psychotropic drugs that Haynes testified about." He maintains that the "discussion of drug use could have put fear into the jury that [he] was some sort of addict," and "much of what was discussed including drug use and drug tests could be considered extraneous offenses."

The record shows that Officer Haynes explained in general and hypothetical terms the types of information he typically gathers from defendants—"if" "any" exists. Olguin does not direct us to any testimony stating or suggesting that he was personally found to have drug or mental health issues. Again, this is not "[e]vidence of a crime, wrong, or other act" by Olguin. *See* TEX. R. EVID. 404(b).

Olguin further complains that Officer Haynes testified that an offense report is a "fair summary of what happened." Olguin argues that offense reports are "not admissible." But the record shows that Officer Haynes simply opined that an offense report, in general, is "usually" a fair summary of what happened. And no offense report was admitted at trial in this case.

Finally, Olguin complains about Officer Haynes's testimony that, during the interview, Olguin denied that he pointed the gun at anyone and stated that his girlfriend took the cell phone. But Olguin does not explain why his counsel should have objected to this *exculpatory* testimony.

Olguin has not shown that his trial counsel's performance was deficient for failing to object to the complained-of testimony on the ground Olguin advances. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) ("To show ineffective assistance of counsel for the failure to object during trial, the [appellant] must show that the trial judge would have committed error in overruling the objection.").[3] We hold that Olguin has thus failed to meet his burden under the first prong of *Strickland*. *See* 466 U.S. at 687–88.

Because Olguin cannot establish the first prong of *Strickland*, this alone defeats his claim for relief. As a result, we do not reach the second prong. *See* 466 U.S. at 697 (failure to make showing under either prong defeats claim of ineffective assistance); *Lopez*, 343 S.W.3d at 144 ("Because appellant failed to meet his burden on the first prong of *Strickland*, we need not consider the requirements of the second prong.").[4]

---

[3]    *See, e.g.*, *Verdun v. State*, No. 14-08-00864-CR, 2010 WL 183523, at \*4–5 (Tex. App.—Houston [14th Dist.] Jan. 21, 2010, pet. ref'd) (mem. op., not designated for publication) (failure to object did not constitute ineffective assistance of counsel where record did not support appellant's characterization of officer's testimony).

[4]    *See also* *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong."); *Sykes v. State*, 586 S.W.3d 522, 534 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *Cotton v. State*, 480 S.W.3d 754, 759 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

## Conclusion

Accordingly, for all of the reasons above, we affirm the trial court's judgment in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).